All right, Council. Obviously, we have lots of lawyers per square inch, and this is always tricky where the time is so manually sort of chopped up. To put it mildly, there's a lot going on in this case. You can be sure, you know, we've read it, you know what it's about, and a lot of the background and so on and so forth, so I'm just not trying to cut you off, but say what you need to say before your argument, and given the sort of chopping this up time, it'll help us, you know, kind of get to the juggler on some of it as opposed to going back to, you know, the beginning of the agency and seeing the fact and on and on and on. So, again, I'm not trying to teach you how to argue, but, you know, it is what it is, and obviously, you know, you're here to help us out, so we'll work with the time as, you know, everybody gets their shot. So, hopefully, that's helpful in terms of that. All right, Mr. Berry, you're on. Good morning, and may it please the Court. Jonathan Berry, Petitioner, Alliance for Fair Employment Recruitment. A rule that facially discriminates on the basis of race and sex now has the imprimatur of the federal government. The Securities and Exchange Commission has determined that NASDAQ's encouragement of race and sex discrimination is in the public interest, and the SEC now has a statutory obligation to ensure NASDAQ's discriminatory rule is carried into effect, yet the agency maintains there's only private action here, that this is race and sex discrimination the Constitution does not reach. Your Honors, that ship's sailed in loose lodge with all nine Justices on board. A law that, and I'm quoting loose lodge, requires compliance by an organization with provisions of its Constitution and bylaws containing racially discriminatory provisions, unquote, violates equal protection. Before you get to the constitutional statutory questions, isn't it the threshold issue that we've got to, tell me if I'm wrong, we've got to turn our, what is it, intercontinental dicta into an actual holding that these SROs are state actors or were made state actors? In other words, we have to do that, correct? To reach the constitutional questions, Your Honor, the Court needs to conclude that there was state action present, and there's a couple different theories of how to get there. But even if we followed any of your theories, that would create a split, at least with the Second Circuit that said these are private organizations and they haven't been dictated to adopt this? Well, we would argue, I guess, two points, Your Honor. One is that we believe that the split, such as it is, already exists, that intercontinental would be binding. Right, but explicitly we said we're not deciding this issue. So there's no way, right, isn't that exactly what we said in the intercontinental? With respect, Judge Higginson, no. The intercontinental case is admittedly a little bit vague in terms of what it's reaching, but in our view, the best reading of that case is that the Court did in fact hold that the intimate involvement of the SEC, the American Stock Exchange, brings that within the purview of the Fifth Amendment, but that the Court did not need to decide what due process—the Court decided due process was required. It did not decide what specifically was required, because in any event, the process actually afforded was sufficient. That's in the enforcement court case, correct? It was a due process case, that's right. I guess I thought that the all-cited burden, or whatever it was, on joint participation has been tightened up now. You've got to show some coercion or strong encouragement by the regulator. So there are coercion and, or at least encouragement, are the normal way or the most common way in which this comes up. But, Your Honor, this Moose Lodge case that I started by talking about speaks directly to the question of private organization on its own initiative creates a discriminatory rule, and what's unquestionably state action, state law in that case, says that that organization must comply with its own rules. That is that state action of the same kind that would apply here. And this is what we have under the Exchange Act creates an ongoing statutory duty on NASDAQ to enforce its own rules under threat of SEC enforcement action. NASDAQ has an ongoing duty under federal law, SEC has an ongoing duty under federal law. That puts us very squarely within the facts of Moose Lodge. So the Exchange is these self-regulating organizations, self-regulating, regardless of an approval order, are state actors? Is that your theory? Or was their delisting rule here, the listing rule, inextricably entwined with government action by virtue of it being approved by the SEC? Which is it? I may be misunderstanding Your Honor's question, but the Moose Lodge, Moose Lodge says that in order for approval to matter, I'm sorry, I'm getting twisted up here, there's an ongoing duty. Moose Lodge is not necessarily an entwinement case. Moose Lodge... What's your best entwinement case for otherwise private organizations? Because I assume you accept that these exchanges are private organizations. That the only way it becomes state action, what they do, is by virtue of the SEC's involvement. It's by virtue of the SEC's, at an absolute minimum Your Honor, it is by virtue of the ongoing duty that the Exchange Act puts on both NASDAQ and SEC. That's not a question of entwinement. In a normal contracting case, if I contract with another party, there's no legal, there's no standing legal reason. So your argument is that they are state actors regardless of this particular approval order? Just by virtue of them being regulated? I would say at a minimum Your Honor, there is, the SEC is of course a state actor, and there will be whether in this case the private organization's action is fairly attributable to the government. And what's your best evidence anywhere in this approval order that the SEC forced, coerced, encouraged NASDAQ to come up with this? Where would you point me to in the approval order as to any evidence of even strong encouragement? So directly on point Your Honor, I think arguments stated by the two commissioners who invited rule making of this type, this is Commissioner Crenshaw and me, who have power to block disapproval because of the structure. I'm asking you within the approval order, where do you point to to suggest? I thought the SEC was staying completely neutral on this. They're just saying, okay, we accept your evidence that investors want this. They may be eccentric, they may be prejudiced, they want this transparency about who board directors are that'll get their money. And therefore, that's a market performance feature. Yes, Judge Higginson, if I may, Pennsylvania Liquor Control Board did not cause a mislodge to adopt its discriminatory rules. That's not necessary for a finding of state action, and that can in some way be attributed to the agency. Okay, so what's the evidence in the record you're pointing to that this is all the SEC? It's not investor-driven to their exchanges, right? I mean, when I read the approval order, it sure looks like NASDAQ and the other exchanges are saying our investors want this information. So we don't, we would not argue that there aren't significant numbers of specific investors and investor groups who have been requesting something like this. Our argument is that both that's insufficient under the Exchange Act, but more importantly, SEC initiating this is not necessary in order to make this mislodge. So your argument to us is, let's say there was investor interest that we think we want to give our money to board leaderships who have military experience. So we want information about veterans. That's beyond, Exchange Act could not, that would be, there's no delegated authority to the Exchange Acts to respond to investor interest in that. Or even something maybe more objectionable. We want to know if there are any Christians on these claims. Your Honor, we would say that investor, simply investor demand, investor interest in a subject is not sufficient under the Exchange Act, even the SEC. That is your however prejudiced or eccentric. That's your position. It really doesn't have to do with gays, women, the specific issue. It's not about veterans, not about religious affiliation. They, exchanges simply can't ask for that. They need, they need, they need substantial evidence that's going to, that's what's being proposed is consistent with the Exchange Act and it doesn't run afoul. But isn't it, no, it's consistent if you're telling investors, here's more information about the people you're giving money, right? It's not just going to be the white old boys who self-perpetuate themselves in a little black box. We're going to give you whatever you are interested in. People who want to, you know, stop investing in South Africa. We're just going to give you what you toss. Doesn't that help the market function according to investor interest? So the, the D.C. Circuit has spoken more about this, that sort of mere, of mere interest, mere, mere curiosity is not sufficient, that there needs to be some kind of connection to the purposes of the Exchange Act. Disclosure, put another way. The purpose is economic efficiency and competition, right? Essentially enhance economic performance. And, and, and in this, in this case, Your Honor, the Securities and Exchange Commission concluded that there was, in essence, there was not substantial evidence to Okay, we'll hear from both of us on that, but I'm, I'm remembering it pretty well. Note 60 in, you may know them specifically, I'm sure you study them closer than I did. It says the exchanges say the investors want this data and it helps us sort of find talent. Right or wrong? The difference is between finding that there's an actual association and finding investor demand. Like mere, I think it's, it's been a very long time since courts have said that mere, mere customer preference is sufficient to justify discrimination. Okay. I don't see why it'd be Good morning, and may it please the Court, I'm Margaret Little from the new Civil Liberties Alliance, representing National Center for Public Policy Research. I'd like to discuss three dispositive points today. Simply put, the Exchange Act cannot bear the weight that SEC and NASDAQ place upon it. Section 65 of the SEC Act, 34 Act, set up the SEC to prevent fraud, manipulation, to establish just and equitable principles of trade, free and open That's the limit of its remit. It can act only within the constraints set forth by Congress. My second point, not only does that statute provide no authority, it expressly forbids SEC from regulating in this matter. Again, Section 65 says regulations must not be designed to regulate matters that are not related to the purposes of this Act or the administration of the Exchange. When, as here, an agency adopts rules which extends its authority into unrelated and non-material matters, courts must blow the whistle and call the out of bounds. And finally, the board diversity rules compel speech in violation of the First Amendment. These rules impose unprecedented demographic quotas and disclosure requirements regarding race, sexual preference, and sex on companies valued at over 20 trillion dollars. Yet there's nothing in this statute, the authorizing statute, that permits them to do that. In MCI versus AT&T, the language you read is that just and equitable trade. That's in the eyes of the investors, right? They decide what's equitable as to where they put their money. They put their money with these large traders like Vanguard and Fidelity. If I want to put my money in the hands of a veteran, I get to decide that, don't I? I need that information. Or are you saying no? I am saying no to that. People put their money with these large investors in order to get the best rate return they can. They do not invest their money in order to have their political decisions made for them. That's not how we make laws. But it sounds like what you're saying is the opposite. You're the one deciding what the information will be. They can't even get told or be told whether people are veterans on the board? Well, this is a compulsory rule with real sanctions. If somebody wants to disclose such materials, they are free to do so. And their shareholders are free to communicate? I know, but NASDAQ's rule, and I'll just obviously push you to the other side, but NASDAQ's rule is disclose or explain. To me, it sounds like investors get whatever crazy information they want, because that's going to decide where they put their money. How is it a quota beyond just, we'll tell you who your people are in that board that are going to invest your money, and that way you can decide who it is that you think is an equitable person to handle your money. Because the rule says two things. It sets an absolute floor requirement of what companies must have or they must be. They must have or must disclose whether they have. They must, well, disclose. And otherwise they can explain, this is not in your interest for us to only have gays on the board. They can explain. It's that compulsive explanation that deeply offends the Constitution. Well, back in Reilly v. National Federation, there's a line. But do you agree with me then, if we're going to jump to the constitutional argument, you've got to establish that the exchanges are state actors. And would you defer exactly to what co-counsel argued on that, or would you have anything to add? I have a few things to add, but we're certainly not in conflict at all. I do have, in the questioning earlier, there was a suggestion that, in fact, and this is also a point made in the SEC's brief, that this is something that just NASDAQ wanted, and we're, you know, it seems fine with us, so we'll adopt it. NASDAQ's rule directly cited Crenshaw and Lee as reasons for enacting the rule. It's in the record at 80,475. I guess I'll ask you the same question. That approval order is 330 footnotes about. Do you find, can you point me anywhere in the order where it suggests that the SEC cares about whether this is good or bad, other than investors wanted it, they got empirical data from the marketplaces that investors will respond financially, and that's within the orbit of the exchange act? Even the SEC admits in its briefing. I'm asking about the approval order. No, I'm getting there. They admit that the SEC and the exchanges are under no duty to simply adopt what an unspecified number of investors want. So, you know, they could come in and want to know whether people on the board root for the Yankees. But if there's empirical data, the marketplace is telling them, in all the comments to this rule, that this will help capital movements. It'll help the performance of companies, and it's certainly what investors want. The SEC explicitly found that there was no substantive evidence, conclusive evidence, on that one way or the other. You say all the comments filed. Give me the record site where they find there is no evidence to support the suggestion that this is in the briefing. Just give me a record site. Don't say it's in the briefing. In the approval order, I've read all those footnotes. You must have. Where is their support for what you just said? I will provide you with that on rebuttal, and I'm sorry I just don't have it in my notes here. Isn't it crucial if you're making an APA that you're citing that there's no substantial evidence to support their conclusion that this fits within the exchange act's limits? You have to be able to say it was arbitrary, that they failed to look at data, they didn't have it. You've just said they did, but where in the approval order? We'll get that to you on rebuttal. But the SEC itself noted that they are not in the business of assessing and responding to unquantified investor demand, and that's also not how we make our rules in this country. Who knows how many Americans are for this or against this? That is not anywhere in the record, nor is how many investors want this or don't want this. Nowhere in the record. So the market will take care of that. NASDAQ's decided we're going to go ahead on this. We're going to take a little winger, and if in fact you're right, investors don't want it. Government power is not a laboratory in that fashion. We don't make our laws by unquantified demand. But that assumes NASDAQ's the government, and you said you were going to add to what he said. Why is NASDAQ the government? Because it is regulating Americans. It is in fact threatening to delist people if they don't speak, and that is a serious First Amendment violation, not only under Riley, but under Hurley, which says that if you choose not to speak on controversial questions, you have every right to do so. Did you reach your third? I know you said you had three points, but I think you did. Well, I didn't say— Was there anything you could do? Did you make the explanations you wanted to make on the three points? Well, Judge Higginson, help me in there. I'm eager. You're nice to say that. I hope I'm just as enthusiastic with opposing counsel. I understand, but I did reach the First Amendment cases and the most important cases, and the only thing I think I didn't quite get to is that the rule expressly forbids the SEC to regulate outside of its remit. It must stay in its regulatory lane. Thank you. I just want to make sure you got to eight minutes worth. All right, but you preserved your rebuttal time, but that obviously needs a rebuttal. Okay, we shift gears to Ms. Harden from the SEC. Good morning. We have the support of Tracy Harden on behalf of the Securities and Exchange Commission. If you want to turn first to the state action issues that the Court's been discussing already this morning, and Judge Higginson, you're exactly correct that in order for the Court to reach the constitutional issues here, the Court would have to create a split not only with the Second Circuit, but also the Ninth and arguably the Fourth and Seventh, who have also found that SROs are not state actors. Nor is the Intercontinental Decision binding on this panel for precisely the reasons Your Honor already pointed out. The language that the petitioner is pointing to is dicta, and regardless, the focus of the analysis has unequivocally shifted away from Burton and the joint participation doctrine that Intercontinental Court relied on. Okay, so I mean, you're in the One Circuit, where the other circuits have said, we've decided this question. It's either disagreed with it or it's sort of waived for dicta want. But are you saying it's dicta and it's not persuasive? It's dicta and we now know it's wrong? Or even accepting that, that was in the context of enforcement, where there's more intertwinement? Which of those three would be your primary? Or do you have a fourth? I think the primary argument would be the second one, Your Honor, which is that it's dicta and therefore not binding. It is also incorrect under the modern state action test that both the Supreme Court and this Court have recognized, where we've shifted away from joint participation to looking at the precise action that's alleged to be unconstitutional and whether there's sufficient government involvement in that action to fairly attribute it to the government. Very basically, Supreme Court and Fifth Circuit have both said that, and the cases you're citing are the ones that were cited to us, just in oral argument? Your Honor, the cases I would focus on would be this Court's Frazier decision. Of course, the Supreme Court's decision in Jackson, as well as the Bloom case, I think is also instructive. And the Sullivan case from the Supreme Court. I think all of those get to this what happened here, which is a government determining that something is permissible under the law, but it is still the product of a private initiative and a private choice to engage in that activity, that there is no state action. Now, their primary fact point, though, is that it seems the record does display that NASDAQ was responding to statements by commissioners. And I think they're simply misreading both those statements and the law on that point, Your Honor, because both of those statements were made by two individual commissioners who were in defense, who were not speaking for the commission as a body, nor do individual commissioners have the ability to make policy for the commission. And those statements were criticizing a commission rule for not going far enough on diversity. There's no discussion in those statements about a need for exchanges, for example, to take up the mantle on this, or recommending exchange rules. So when we look at the record, you would say it's clear that this rule came into play because investors told NASDAQ they wanted it, and the SEC stayed neutral. They didn't impart a view as to its wisdom, didn't encourage it, certainly didn't coerce it. Is that a fair statement of the government's position? Yes, Your Honor, that is a fair statement. And I will, just to sort of close out the point on the commissioner's statement, point out that government officials make policy speeches all the time, as they should. We should want transparency from government officials, but to say that every time they make a policy statement that amounts to substantial encouragement and can lead to state action would really expand the scope of the state action doctrine and constitutionalize private conduct in a way that the Supreme Court has told us is inalienable. Obviously, we've seen a lot of law about state action in this last year and back in the civil rights era, and so when the government does a wink and a nod and private actors respond, their theory here is that the SEC commissioners nudged them and said, we think a social justice mission is good here. We think that we need to force American companies to put gays on boards. That's, as I see it, and if that were true, if there were evidence that this was responsive to that type of SEC initiative, then you'd have state action. Would you agree? I think if there were substantial encouragement in the form that the courts have required, but that's just not borne out in this record, right? And it's more than a policy speech about individual officials who don't have the authority to act, right? I think if you... How broad do we look for the record? Does it have to be confined to the approval order? I think, Your Honor, if there were, it would be a more complicated question if you had a commission document where they had said, we're doing X as an agency, we sure hope exchanges go to Y, and the commission is speaking as a body. And what do you point to in the approval order, same question I asked them, where it's clear that the SEC is neutral on the wisdom of this? Is there anything in the approval order where it's just the SEC saying, we aren't saying this is good or bad? I don't know that there's a precise quote. I think the absence of any evidence that the commission is taking a policy position is important. I also think it's important to think about the statutory context in how this arose and what the commission's discretion is, right? If it finds that something is consistent with the act based upon substantial evidence in the record, it shall approve the vehicle for the commission... Consistent with the act, and what word in the act is this most consistent with? Is it the word equity? Or are you actually saying they made empirical findings that this type of information improves the performance of the market? The commission did not go that far, Your Honor, but what it did was find that given the demand for this information from a broad swath of the market, right, this is not just a vocal group of investors as the commission pointed to, right? We have a broad swath of institutional investors, retail investors, managed funds, issuers... I'm going to ask you the same strong question I asked them. What footnote are you pointing to to support that the SEC here did find that it was broad investor interest? It was not special interest social justice stuff. It was broad. Where would you point to that they made that economic finding? Because they do have an EPA argument. That's correct, Your Honor, and I would point you to page 7 of the joint appendix where the commission is discussing the demand for this information. I also think it's important to take a look at the commission's discussion of the empirical evidence. The petitioners are arguing here that the commission rejected that evidence altogether, and that's not what the commission said. What the commission said was the empirical evidence is inconclusive, but it is a matter of reasonable debate, and importantly the commission went on to find that any evidence that tended to show that there might be a potential for harm was largely inapplicable here. And so what the commission said on page 10 of the joint appendix was, given the informational and disclosure benefits that they'd already found, and the fact that the any potential harm are likely to be comparatively low, it's finding consistency with the act. And Your Honor, that's how you distinguish the D.C. Circuit's business roundtable, that in fact they did do a proper cost-benefit analysis. I think you're referring to the second the second one, the 2011 one. That's correct, and I would say two things about that case. Yes, here there was a sufficient grappling with the evidence. Second, that was a commission rule, and I do think that's important because a lot of the court's criticism there was about a failure to address incremental costs and benefits with respect to the trade-offs being made in a commission rulemaking. Certainly that's not something that the commission does in the posture of an SRO rule, where it is a up or down, yes or no. So that kind of grappling with alternatives is not something the commission does in this posture. I'm guessing you're familiar with our Durkheisy decision? I am, Your Honor, yes. Well, what about applying that here? There's just no intelligible principle that Congress has given the SEC about this type of social justice costs. How would you respond to that argument? I think there's two really important points to respond to that argument. First, of course, the premise of that is a public non-delegation argument that assumes you have government agency action. Your Honor is correct that NASDAQ is a private for-profit entity that's part of a publicly traded company. So it's simply not the same as a government agency where you need a particular authorization for Congress for each action, for them to engage in their business judgment. The question is actually different here, which is whether... You said you were going to make two points. Is this your second? It was just the back end of the first, which is just that the question is, does this fall within limitations that Congress has drawn on their action, not whether there's a specific authorization? But with respect to the Commission's action, because of course the Commission is a government actor, there's very clear principles guiding the Commission's decision making here. There is a detailed procedure under Section 19 of the Act which calls for the remainder of the relevant provisions of the Act as well as Commission rules. Here the focus was on Section 65 where there are several affirmative obligations the Commission has to find are advanced as well as it has to find that it doesn't transgress any of the prohibitions. So there's a number of intelligible principles here. I thought a difficult question to that was what about veteran information, but a difficult question for you might be, would you just say, if the investors want it, we got to approve it if the question instead were you've got to disclose religious affiliation of every board member? I think this may not be satisfying for your honor, but the real question is whether there's substantial evidence to establish a connection to the statutory findings here. I think in some of the more inflammatory examples, it's very hard to imagine to have the same kind of record of a demand for this information across the market where the market has valued it and importantly no contrary evidence of harm. Okay, so it is both. It can't just be prejudiced investors want to invest in Christian companies. It's got, the SEC still has to make sure that's not going to harm what, the economy? I think it's not going to be harmful to the market or investors. Wouldn't it always be harmful if we were allowing investment into bigotry, for example? I don't think the societal judgments and those kinds of value judgments are the determination that the act calls on the commission to make, nor do I think that's really where we want to be, that the commission, despite evidence that this meets the market-based objectives and purposes of the act, is making a value judgment that nonetheless something is a bad idea. I point to the harm, your honor, because one of the objectives in 65 is designed in general to promote the protection of investors and the public interest. So I think if there were evidence that this was harmful to investors, that would be a complicated finding to make, but that's certainly not what we have here. Okay. Thank you. I'm the opposite of what you said. You know, the SEC is not just responding to the investor request, but I forget what it's characterized, but in effect sort of enlisted, if you will, or encouraged, or whatever, whatever, for the flow, as opposed to merely responding to something neutrally generated there, may not be articulately stated, but the point is, what's your response? Their argument is, yeah, as you said, it's neutral, but they really are the ones that were the catalysts for this, so therefore they kind of step in the shoes of young children. So the question is, on the face of the order or in this record, footnotes, what's the best response when we dive in to that whole piece? We've got a mixture of stuff here. So what do you point us to most to be focusing on generally? I think what I point you to most is the absence of any evidence that that happened. The best they can come up with are these statements from Commissioners about this morning. There is no other evidence that this was a Commission initiative, and I think that's the line that the state action case law draws. You have to have coercion or substantial encouragement such that it's fair to say this was in effect the action of the government in order for there to be state action, and there's simply nothing that rises to that level in this case. This was a private initiative undertaken by NASDAQ, which is a heavily regulated exchange. They therefore had to come to the Commission for approval, but that approval is a determination merely that it is consistent with the boundaries the Exchange Act has drawn for their private action, and that initiative and that discretion within those guidelines was taken by NASDAQ here, and the Supreme Court has been very clear in Sullivan and in Bloom and in other cases that that kind of mere acquiescence or approval of something that is a private initiative is not state action. I do also want to briefly address the misjudge point that they have raised, and I think it's important to note what happened in that case, which is the underlying rules were not struck down as state action in Moose Lodge. What the court did was enjoin the application of the municipal ordinance against those rules, and the reason that was the outcome is precisely what we're talking about here, which is that the underlying rules were the product of private initiative, much as these were here, and the fact that after NASDAQ makes the voluntary choice to propose a rule, it is thereafter required as a regulated entity to apply it consistently doesn't change the independent nature of that underlying choice, and I think the Supreme Court's opinion in Bloom is instructive on this. There the court rejected an argument that the presence of penalties under the Medicaid Act for nursing homes that fail to transfer patients to appropriate levels of care was sufficient to make those transfer decisions state action, and what the court said there was the penalties aren't making those individual decisions. That's precisely the case here, and to the extent there is an analogy to Moose Lodge, the other I think important point is the court there had a specific challenge to the municipal ordinance in front of it. That is not the case here. The petitioners are challenging NASDAQ's rules. They're not challenging Section 19G of the Exchange Act, so that question's not before you, nor is it right, and should the commission ever bring an action against NASDAQ for failing to enforce these rules, there would be an opportunity for judicial review of the question of whether that enforcement rises to the level of state action. All right, one last question. I think, not unsurprisingly, we have already examined these briefs that are filed here. Is there some takeaway from all the filings that's helpful to us from rambling these? I think the two things I would point the court to most prominently are the briefs by the amicus, which really lays out sort of the relationship between the exchanges and the commission here and the distinction between exchange corporate governance standards, where they have more freedom to act in that area that the commission does in its own rulemaking, and you'll see that echoed in the first business roundtable case from the D.C. Circuit as well. The other amicus brief I would point you to is the two points that are important. One is that they do, in fact, rely on more diversity information to make decisions. That's sort of the core of the rationale as to how this is related to the Exchange Act. And I think the other point they raise is the value they find in the explanation component of the rule as well. All right, thanks so much. Thank you, Your Honors, and may it please the Court. I'll begin by setting out the two primary reasons the petition should be denied, and then Judge Higgins and I will address some of your record-based questions specifically. The petition should be denied for two primary reasons. First, the Constitution doesn't stand as an obstacle to NASDAQ's rules. NASDAQ, like other securities exchanges that have existed since the nation's founding, is a private actor, not an arm of the state. The rules governing voluntary, contractual relationships between NASDAQ and companies choosing to list on its exchange are private action that, if anything, the Constitution protects, not constrains. Any other conclusion would create a circuit split, as Your Honors were discussing, with at least the second and ninth and probably the third, seventh, and fourth circuits as well. But we're sort of partway there already with intercontinental, so it's sort of the same question I'd ask both sides. How do you deal with intercontinental? Certainly, Your Honor, and I agree with my friend at the SEC. I think first and foremost, that language was dicta. The language clearly identifies it as dicta. No less than Judge Friendly, in his Solomon decision, referred to the court's holding as dicta. So we think it's dicta. Even if it isn't, it's been undercut, as this court has recognized by subsequent Supreme Court precedent. And I think it's telling that the Supreme Court itself in Jackson limited burden to case on which this court relied in intercontinental industry. The Supreme Court itself limited burden to its facts. And this court, in both Yeager and Frazier, recognized that limitation. The best current case under binding Fifth Circuit law as to what has to be shown to make these organizations state actors is what? What's the test? So I would say that the court's decision in Yeager probably sets out that test. And that decision looks at a level of pervasive entwinement. I think that's the language that the Supreme Court used. Can I just interrupt? Yes, no, please, Your Honor. As counsel for NASDAQ, do you deeply object with record support to the suggestion that this is top-down SEC to your client to have sort of a woke mission to get minorities and gays on boards? Or do you think the record is conclusive? This is bottom-up. Investors say, right or wrong, we want this information to know where to put our money. Your Honor, absolutely the latter. And to pick up on Judge Stewart's question about the unique— Yes. —best record support, that it couldn't possibly be these stray commissioners, it's from your investors. Well, where do you point to in the record? So two points, Your Honor. I think the best place to point to the record is pages 7 and 8, J8, 7 and 8, where the SEC itself and its order is talking about the diverse collection of commenters. These are commenters before the agency. This is not just NASDAQ's say-so. These are legion of commenters who submitted comments, which is the record before us, who expressed interest in board diversity information, including institutional investors, investment managers, listed companies, and individual investors, as well as statements made by institutional investors, asset managers, and business owners. So your client would impose a similar informational rule, disclose or explain, if you had percolating up interest in Christian leadership, military leadership. Whatever the investors want, that's valid under the Exchange Act? Or is there a point where it isn't consistent with the Exchange Act focus on fair and equitable trade? I think the latter, Your Honor. I think there are two limitations. I think, the Exchange Act imposes limitations on disclosure rules. To be sure, disclosure is the touchstone of the Act. That said, disclosures must pass through the view of the Exchange Act and be consistent with, and importantly, that's a limited review that the SEC is performing. It is if those rules are consistent with the Exchange Act. I would also point- And with the Exchange Act, but then to be more precise, with what subsection? These rules are consistent with the Exchange Act, but they do what? The SEC found that they are consistent with one of the clauses that talks about fair and equitable trade and also removing impediments to fair and equitable trade. I think as the SEC explained in its order, it sees all of the statutory language as distilling down to a principle of promoting fair and orderly markets. Certainly, I think this rule, it is a classic disclosure rule, as Your Honor has been talking about. The premise is talent is universal, but maybe we've got structures that mean that actual opportunity to get on boards hadn't perceived the variety of talent. This rule is beginning to say, let's get it all on the table. That's going astray. I interrupted you. You said two points petitions should be docked. First is, these are private actors, not arms of the state. Would you want to jump back to second? Yes, certainly. Second, and I think this is what we've been talking about, Judge Chickenson, is that the SEC reasonably concluded that NASDAQ's modest diversity rules, which require highly sought-after disclosures that increase transparency, level the playing field for small investors, and contribute to many investors' decision-making, are perfectly consistent with the Exchange Act. Your Honor, that's what we've been talking about, how these rules are textbook examples of disclosures. How does it work for a small investor any more than a big investor? Certainly, Your Honor, because part of the rule is the diversity matrix, which lays out the information in a searchable and easy-to-read format. Otherwise, investors would have to glean this information on their own, and the SEC specifically addressed this. It found there's an information asymmetry between the large investors who have very large staff and can compile this information from scouring websites or statements or websites of the company, and smaller investors who would have to do all of this on its own. One of the large benefits of the rule and how I think the rule really functions to further the purposes of the Exchange Act, to remove impediments to fair and orderly markets, is to get at this information asymmetry from on-board composition and how companies approach diversity on their board, and to level the playing field between the small and the large investors. And, Judge how many investors, how much is enough? And I think wherever that line would be, and we don't think there is an empirical line, I think in this case, if you look just at the investors referenced in the amicus brief that my friend at the SEC referenced on behalf of institutional investors, that's 40 trillion, over 40 trillion in funds represented by that brief alone. So we think wherever that line may be, Judge Higginson, in this case, the outpouring of support that prompted NASDAQ to take a look and adopt a modest disclosure rule, we think the Constitution does not pose an obstacle to that, and it is perfectly and entirely consistent with the Exchange Act. Put aside data action, constitutional, First Amendment, or equal protection, they do argue also non-delegation, and separately they're saying if we look at the order, it's arbitrary and capricious, that's more the SEC's argument. Could you address whether your client doesn't have the authority to So sitting aside the characterization of the rule, Your Honor, I think there's no non-delegation problem here for two reasons, one of which Your Honor has already highlighted, and that is that this is a NASDAQ rule that the SEC approved. So whatever the status of the delegation, it really doesn't matter because the SEC here has approved the rule, and that's the same time, it is the SEC's approval of the rule that the Supreme Court has held time and again does not suffice as state action. So we think for both of those reasons, there's no non-delegation problem here. So if that is responsive to Your Honor's question. When we look here, is there, the counsel officer says, well, you know, the SEC sort of nudges, well to the question whether it's bottom up or down. Is the question systemically, is there anything that shows or doesn't, they have already said in this case, if we get to the Sovereignty and Preciousness, that the action of the SEC, at least if it's your client, is inconsistent in other patterns of behavior that you see in approving, you know, just a whole slew of things. For sure, it's just again, whether it's negative, you've got to draw a negative approving. I just, I haven't made that entirety of what's all over the place. I'm just trying to answer your question. First of all, I think the fact that my friends on the other side are forced to rely on two statements by individual commissioners to show that the SEC in any way encouraged this, I think that only underscores that they cannot possibly meet the test under current Supreme Court and the law of the circuit for that. So I think that that underscores that they cannot possibly show that, in addition to all the other reasons we've talked about. Second Your Honor, I think this rule, it's a disclosure rule, but it also touches on matters of corporate governance. And there is a whole series of rules addressing things like director independence, disclosure of codes of conduct, disclosure of any third-party compensation that directors receive. So I think we would say that this rule is well within the mainstream, both in terms of disclosure rules and also rules that touch on corporate governance in a way that the exchanges have always done and have had primacy in doing. So if that is responsive to Your Honor's question. Commissioners, the SEC's remarks at the end suggested there may be a likeness issue. Thinking about limiting principles, does NASDAQ concede that if we got to the point where a company were going to be disciplined or delisted for non-compliance, in other words, now we have an enforcement action rather than just a listing one, would that sort of then heighten into state action? Our position would be, Judge Higginson, that if NASDAQ did not enforce its rules, if the SEC then brought an action against NASDAQ seeking to compel enforcement of its rules, only at that point would you have enforcement and only at that point would you have state action. I think just saying that... The SEC against your client. I'm saying that let's assume your client decides to discipline one of the companies. No, Your Honor, and I don't think my friend on the SEC would disagree. Whether we are proposing rules or enforcing our rules against the companies who have voluntarily chosen, that is still a private action. It would ripen, Your Honor. Potentially, if we were to not enforce our rules and the SEC would bring an action to enforce it, then you would have the mislodge situation because then you would have enforcement, and even then, as in mislodge, the remedy would involve, as the Court did in mislodge, striking the provision that gives the government authority to enforce, not the private rules, which remain at all times private rules. Thank you. Thank you, Your Honor. All right, we'll go back to you, Mr. Bennett. Father Sresh, do you want to start with that? Do you disagree with that? Well, I think the question here really on ripeness and when this kicks in, I think it underscores the fact that the Securities and Exchange Commission could not bring itself to say that provisions of the Exchange Act remain constitutional after the approval of this rule, and a proposed rule cannot be consistent with the Exchange Act, which is what the SEC has defined, if the rule would be unconstitutional or would render other provisions of the same statute unconstitutional, like the enforcement provisions. So right now, even apart from the state action question, under the Exchange Act, this order was unlawful, and the SEC does not directly contest that question. What about the direction of my question, which is it's ripe? The issue is not ripe at the moment, that you actually may have state action, obviously, not that disagrees with the suggestion of mine, but you might, if they actually disciplined the company for noncompliance with the Listing Rule, that's when your arguments, the constitutional ones, would happen. So I guess I was speaking to the Exchange Act portion of this. On state action, there's an inflammatory rule. I don't believe under ripeness doctrine, facial challenges doctrine, that it would be necessary to wait until such a thing. In fact, if I may judge, the comparisons you made in terms of religion, the veteran disability would be inflammatory. This concerns, on its face, enabling investors to discriminate on the basis of race. That is perhaps the most socially inflammatory question we have in America today. Maybe they're doing it for social justice purposes. Maybe they're doing it for bigotry purposes. It doesn't matter. Why are the disclosures inherently discriminatory? So we have, because they encourage discrimination on the basis of race and sex. That's the standard under W. H. Scott in Judge King's opinion, it's that fact in this court. If I may... I'm sure, I expect you're going to be given as much time as we have questions, so on that last point, agreeing, you heard my comment about no one in America would deny there's talent everywhere, but a lot of it's just never been recognized. It tends to correspond to often underprivileged minorities, and they clearly haven't had opportunity in Wall Street's board rooms. So if all this rule is saying is, let's identify talent that hasn't been identified before, right? And boards tend to self-perpetuate. They work in a little black box. Let's just have the board disclose what their background is. Like, we want to know judges. Any judges on the 8th Circuit that are women? No. Everyone got a concern. So why isn't this pretty healthy information? I think, Judge Higginson, you're anticipating one of the, what is in Maine, the only permissible ground in which our Constitution would tolerate discrimination on the basis of race, which is readily in prior discrimination. That is not the record we have in this case. The commission did not base its approval on any kind of remedial rationale. The basis was investor demand, and investors may have their own, all their various private motives for doing so, but we have over and over again these statements about wanting to drive diversity and increase diversity. But as I, diversity and remedying prior discrimination are two separate rationales, the first of which, of course, is up for active reconsideration right now at the Supreme Court in the Harvard and UNC cases that are being argued at this time. If I may, I'd like to speak briefly to why it is we can't hide behind, or the SEC can't hide behind the fact that NASDAQ privately initiated this. We're not, so first, the SEC had to affirmatively determine that this facially discriminatory rule is in the public interest. That was part of its obligation under the Exchange Act. They did it. It's also not equitable to demand information for the purpose of discrimination on the basis of race and sex. That's not, that's not possible. And lastly, public initiative is not the only ground for a finding of state action. You can have situations where private initiative is probably the spark or the first domino to push things into state action. Entwinement remains good law in this circuit. This includes via the fact that Intercontinental Industries is cited multiple times for its constitutional holding. The application of the Fifth Amendment in subsequent opinions by this court remains good under the rule of order. So, are you saying the holding is universally treated as victim?  As we've explained, we think that the best read in the case itself is that there is, that is a holding, or else the rest of what the court says doesn't make sense. But more to point out, in Harding v. American Stock Exchange and Northern Alabama Express Incorporated v. United States, these are two Fifth Circuit cases that are on page five of our reply brief. What do you do with the argument that so many male vitality had, it was undercut by, you know, later Supreme Court, which relied on some burden, and obviously the federal. So, what do you do with that? Assuming you had the vitality instead of this, what's your response to? I have, if I may, I have two responses. One is Frazier, 1985 decision by this court, which postdates the big trilogy of what we could call modern state action cases in 1982, which talks directly about a symbiotic relationship as an ongoing, viable theory of state action. And the second is Looselodge was itself directly referenced in a positive light in those state action cases. It's Lugar v. Edmondson. I don't have a case in front of me, but it is footnote 20 that recapitulates Looselodge's holding, as I've articulated it, in the unquestionable use of modern law. You say footnote is not undercut, is what you're saying? Oh, I'm sorry, Your Honor? Later Supreme Court cases, or as or, in your view, there's nothing that's undercut the footnote. The... Your Honor, in fact, Looselodge was preserved. But anyway, he didn't bring up Looselodge, and I'm not trying to get you to re-argue something he said at this point. My reference to Lugar v. Edmondson oil footnote, Your Honor, was simply that it's an observation that's been passed on by the Supreme Court that it's, the holding of Looselodge is read as consistent with the thrust of modern state law doctrine. I'll let you wrap up, or there will be a new parting takeaway, if not completely re-arguing what you're arguing, because you're at the bottom. So if there's a parting point on the bottom, you want to make, I'll let you do it. This is, we provide the operational state of the Exchange Act. There is an ongoing duty right now on the NASDAQ exchange to encourage discrimination on the basis of race and sex. That is, it's unlawful for the reasons we've mentioned, and specifically, it results in state action that has to be subject to constitutional scrutiny. What's your best case is that it's disclosure that is tantamount to, equivalent to, the same as discrimination. You've given a lot about discrimination, and I won't give you a previous answer, just, you know, I won't give you a previous answer, but I'm just saying, it's the best case in the world that we've argued, but within the context of disclosure, as opposed to saying you can't, uh, be in the pedestal, you can't move forward, you can't be listed on that sheet of X, Y, this number, and that's not enough, this is too many, da-da-da-da-da-da. I mean, I get the argument in all that, but I'm just saying, in the best case, it's this disclosure that the SEC requires in all contexts, it can transform beyond just saying, tell us what the situation is, and you must have that about you, you follow me? I believe so, Your Honor. I believe the best case, um, on this point is W. H. Scott, um, on encouragement, um, where he, in a case, uh, encouragement means, even if there's goals, or in this case, a, a diversity objective, to use NASDAQ's phrase, um, short of a, of a hard requirement, um, uh, you can have, um, you can have, uh, discriminatory acts take place that would not otherwise have taken place. Here, here we have a rule whose stated purpose and undisputed effect is to facilitate discrimination on the basis of race and sex, and I, I can give, you have four different quotes from the Commission and from NASDAQ. They're on page 14 of all of the library. I asked you what's your best case, and you gave me Scott, so I'm going to take that as responsive to my question. All right. All right. Thank you, sir. Thank you. All right. Back to you, Ms. Little. You did your rebuttal homework. I have eight small points that are very short. First, to you, Judge Higginson, the site is, um, JA 7-8486, Fed Reg, 44430. Okay. That's for the proposition that the NASDAQ was responsive to these dissenting commissioners? No, no. What, what is that? We're, what, what, I have so many questions. Well, that's responsive to what? That is the response for, um, the finding by the, um, SEC that, um, uh, board diversity rules on race, gender, and sexuality are key indicators of good corporate governance. Okay. First, I could say, SEC. So that's number one. Number two is, um, goes to Judge Stewart's question on whether the holding of intercontinental is dictum or actual law. The best case we have on that is called Hamretta versus Green, and that reviewed a Second Circuit decision called Ford, and they made that same argument in, in the Ford case, that this was just a preparatory ruling, and then they went on to find that the constitutional issue didn't, um, arise, so it's dicta. In Hamretta versus Green, the Supreme Court deemed Horne's reasoning, reasoning erroneous, explaining that a constitutional ruling preparatory to a grant of qualified immunity creates law and is no mere dictum. That's at 563 U.S. 692. Third point I would like to make is, I thought it really interesting that you brought up the religious affiliation, because when I went and looked at the studies to see what kind of records, um, the SEC had, and in fact, they are very correct that the record is very inclusive as to whether more diversity improves company performance. But in looking for such information, I stumbled upon, uh, studies that show that religious, um, observations, people who are religiously observant, it doesn't matter what religion, in fact, create ethical corporate cultures. But surely, even in a case where there is hard evidence of that, much more so than the, uh, three categories described here, we wouldn't be asking board directors to state their religion and are they observant. It would be deeply offensive to how we, we govern this country and how the government should use its power, which is carefully. Also, this is, um, the standards that the SEC and NAVSAC are working with are subjective, not objective, and subjective standards always have no recognizable limit. Furthermore, in the record, um, nothing. On the religious point, what are you reading from? Is that the SEC statement? No, no, no, no, that was just my own research. It was your, your own? Right, well, there's studies out there that, and that would not be surprising. Are there studies somewhere in this religious qualification here? So, of course, that would have been submitted, but the point is, there are studies out there that do correlate. I know you had eight points. Yeah, I really did. But I'm going to ask you on, is there any evidence in this record that NAVSAC was responsive to the two dissenting commissioners? Or is it just the quotes from those commissioners? It's the quotes from the commissioners, but I think they, um, they, um, say they adopted it, you know, pursuant to that, um, let me see here, pursuant to that, um, interest by the SEC commissioners who were, we can, yeah, okay, thank you. Go ahead. Yeah, okay, um, on state action, um, our best case is called Blunt versus, um, the SEC, it's an easy circuit case, and it says that an SRO's setting of conditions for people to be part of the SEO is state action of the purest form, and in further exchanges, exercise, claims, yes, it is, and Blunt is spelled C-L-O-U-N-T. Okay, and, um, uh, the, the other thing the SEC did not do was quantify the extent of investors. The only thing they put in, in fact, were institutional investors, which my learned colleague at NASDAQ quantified into, you know, many millions, trillions of dollars, but these aren't actual investors, they're fund managers, and they, they manage funds, they are not representing investors, except in terms of getting them a return on their money. Um, and on this question, because the investor demand is unquantified, it, it, it, it, um, it, it lacks both any measured, uh, meaning, or also any limit on what it could, uh, could apply to. What is, uh, very large, uh, okay, well, okay, um, on the questions you asked, uh, again, opposing counsel, um, whether disclosure rules, that these are mere disclosure rules, and for, fortunately, for their cause, they are not mere disclosure rules, they have sanctions with them, and, and, uh, Facebook was fined 10 million dollars by the, um, SEC for not following NASDAQ's rules. Um, and the, the standard is not, um, this is, should be disclosed because it's not inconsistent with the rules. At the beginning of my argument, I quoted the section in the statute that says it must be relevant to what, the work that the SEC does, and these regulations fail that test. All right, good place to put the piece. All right. Thank you. Thank you, counsel, we appreciate, you know, there's a lot going on, it's an important case, not that all the other cases aren't, but admittedly, there are a lot of layers here, and the whole point of our argument is to, to help the panel as we dig through and we'll read it all and try to figure it out, you know, as best we can. I will say, from my own observation, not speaking for my panel, just, you know, we do have categories of class 4 cases, I mean, most of the ones we put up here are class 3. Class 4s are these super duper complex cases, like we do in the death case, which warrants more argument time, uh, class 4. I would argue, speaking as one who's been here 20 years, that this would fit into class 4. You might not get it because the panel might say no dice, but, you know, it's kind of no harm in asking, but I would say, you see how much time you never give me anyway, uh, so I'm just saying, not every case involved in the SEC, but there are complex, complex cases in our rules that can be categorized as a class 4, which definitionally give you more time, which means, you know, as you prepare, you're not trying to hit something you need to miss because it's an impossibility. I would say I'm probably the minimalist to give you as much time as you got, uh, for whatever help. I'm just missing, just, not the SEC-driven case, whatever, but the school desegregation cases, uh, they're a raft of cases that were class 4 just because you got a whole bunch of lawyers, a lot of issues, and a lot of so-so for future purposes. Look, you may ask anything on SLAM, but at least you ask. If you don't ask, then you don't get it anyway. Just food for thought. All right, um, we'll, uh, work our way through it. Thank you for your responsiveness to us, and, uh, there you go.